Wilkins, Douglas H., J.
The plaintiff, Curtis Groleau (“Plaintiff’ or “Groleau”) brought this action against Shari Russo-Gabriele (“Defendant” or “Russo-Gabriele”) for monies allegedly owed on a home improvement project. The plaintiff counterclaimed for breach of contract and violation of G.L.c. 142A and c. 93A. The court conducted a bench trial on October 27-30 and November 3, 2014, during which it heard from 11 witnesses and received 52 exhibits. The parties argued orally on November 3, and submitted *514 written post-trial materials on November 20 and 21, 2014.
FINDINGS OF FACT
The court finds the following facts by a preponderance of the credible evidence.
BACKGROUND
1. Russo-Gabriele owns the real estate and a single-family home at 107 Central Avenue in Needham (“Property”).
2. Groleau has been a contractor in the construction business for nearly 30 years.
3. In 2011, Russo-Gabriele decided to renovate the Property. She obtained financing for the renovation through Middlesex Savings Bank (“Bank”).
4. Russo-Gabriele originally retained Ground-Up Contracting (“Ground-Up”) to perform the renovation work (“Project” or “Renovation”).
5. Matthew Carp, working for Ground-Up, worked ■with Shari Gabriele for six to nine months designing and bidding the project. Carp’s initial bid came in at $220,000.
6. The plaintiff and her husband, Richard Gabriele (“Richard” or “Gabriele”) worked with Carp on changes in scope of work that reduced the price to $181,800.
7. The resulting scope of work called for materials that were of fair average quality, but not premium quality.
8. Ultimately, Ground-Up referred Russo-Gabriele to Groleau when it determined that it could not take on the project due to a personnel shortage.
9. In September 2011, Russo-Gabriele and Richard met with Groleau and Carp of Ground-Up at a restaurant in Framingham.
10. During the meeting Groleau said that he was a contractor and showed the Gabrieles some photographs of renovation work he had performed.
11. Russo-Gabriele decided to hire Groleau to renovate the Properly.
PERMIT AND CONTRACT
12. On September 14, 2011, Groleau called Russo-Gabriele at her office at MIT Lincoln Labs in Lexington and asked her to meet him at the Needham Building Department. She immediately left work, drove to Need-ham and met Groleau at the Building Department offices.
13. When Russo-Gabriele arrived at the Building Department, she got into Groleau’s truck. Groleau handed her a document with a Building Department document titled “Affidavit/Home Improvement Contractor Law Supplement to Permit Application.” (“Affidavit”). He told her that she needed to sign the document in order for a building permit to issue for the renovation.
14. Russo-Gabriele read the Affidavit quickly. The Affidavit identified Groleau as “Home Improvement Contractor” and contained Groleau’s signature, his address, telephone number, and construction supervisor license number (which is not an HIC license number). Immediately above Groleau’s signature appear the words: “Signed under penalties of peijuiy: I hereby apply for a permit as the agent of the owner:' [dated 9/11/11 and signed by Curtis A. Groleau].
15. At the bottom of the Affidavit the following language appears:
Notice is hereby given that:
Owners pulling their own permits or dealing with unregistered contractors for applicable home improvement work do not have access to the arbitration program or guaranty fund under M.G.L.c. 142A.
Notwithstanding the above notice, I hereby apply for a permit as the owner of the above property: [dated 9/14/11 and signed by Shari Russo],
16. Groleau gave inconsistent testimony at trial and at deposition on whether he knew of the c. 142A arbitration process and whether he discussed c. 142A and waiver of arbitration with Russo-Gabriele before the affidavit was signed.
17.1 credit Russo-Gabriele’s testimony that she and Groleau “did not really discuss the content" of the Affidavit with her before she signed the Affidavit. However, she had sufficient education, work experience and intelligence to read and understand the “Notice is given . . .” language. She had the opportunity to do so. She read it quickly and signed it, without thinking a great deal about the implications of that language.
18. Groleau then filed the Affidavit with the Building Department. The Building Department issued a permit, listing Groleau as “licensed contractor.” While the building permit identifies Russo-Gabriele as both the owner and contractor, it was Groleau who dealt exclusively with the Building Department and was present for all inspections.
19. Within one or two weeks, Groleau provided Russo-Gabriele a complete copy of the affidavit. The copy reflected Groleau’s signature. It included no line striking out Groleau’s signature.
20. On October 3, 2011, Groleau and Russo-Gabriele signed a written contract (“Contract”) for the Renovation.
21. The Contract provided that Groleau would be paid a total of $188,500 for the Renovation. It provided that the schedule of payments would correspond to the disbursements from the Bank. It set forth a completion date of February 15, 2012.
22. At the time of the Contract and the work, Groleau was not registered as a Home Improvement Contractor (“HIC”) under G.L.c. 142A.
23. He did not inform Russo-Gabriele that he lacked a HIC registration. Russo-Gabriele first learned of the *515 HIC registration requirement in connection with this litigation.
24. On April 26, 2012, Groleau signed an application, as the “authorized representative” of Russo-Gabriele, to amend the permit and plans for the Renovation, for the purpose of altering the front porch. This application was submitted to the Building Department and was approved the following day.
25. Groleau hired all subcontractors, except for the tile and carpet installation. He was the “contractor of record” on the project, according to inferences drawn by the court from a fair reading of the Building Department’s documentation.
26. While Groleau was the contractor on the project, Russo-Gabriele had no direct contact with the Building Department.
PERFORMANCE OF THE CONTRACT
27. The Bank had a policy not to disburse funds for a particular component of work until the Bank’s inspector, Trinity Inspection Services (‘Trinity”), had certified that the work had been completed.
28. After Trinity certified that the work had been completed, the bank would release funds to Russo-Gabriele by transferring funds into her checking account.
29. The Bank allowed an exception to its “inspection first” policy for the initial deposit. Russo-Gabriele delivered a check to Groleau for $35,000 as an initial deposit on October 3, 2011.
30. After that, she employed the following procedure for disbursing all further payments under the Contract to Groleau:
Groleau would request an inspection of a particular component of work that he believed had been completed.
Russo-Gabriele would request that the Bank arrange for an inspection.
When the inspector certified that the subject work had been completed and the corresponding funds had been transferred to Russo-Gabriele’s account, she would issue a check to Groleau. In some instances the amount of the check corresponded exactly to the amount of the disbursement. In a few instances, Russo-Gabriele issued a check for less than the disbursement amount and retained the difference for allowances set forth under the Contract for various items, including kitchen cabinets, plumbing fixtures, lighting and the fireplace.
31. Whenever Russo-Gabriele deducted an amount from a disbursement for an allowance, she showed Groleau and explained the amount of the allowance she was taking and the purpose for the allowance. Often, she showed him the disbursement sheet from the Bank. Groleau did not object to this practice.
32. The Bank did not pay Mr. Groleau directly. It disbursed funds only to Shari Gabriele.
33. From the Bank’s point of view, the loan was confidential and would not be shared with a contractor.
34. There was a modest line item in the Bank’s budget for contingencies and overages. Groleau was not aware of that item.
35. Because the original Ground Up proposal did not account for new windows, the Bank loan was short of funding the full amount of the Project.
36. As early as January 2012, Ms. Russo-Gabriele was asking the Bank about additional funding.
37. By mid-February 2012 — the scheduled completion date in the Contract — the project was approximately 50 percent complete.
38. Several delays had occurred by that time. Near the beginning of the Project, Groleau’s workers discovered an unanticipated rodent infestation, which required clean up and remedial work that delayed completion by as much as 3 weeks or more. Russo-Gabriele was also late in ordering some of the materials.
39. In or about February 2012, Russo-Gabriele began complaining to Groleau about what she believed were substantial delays in the project. She also expressed similar concerns by e-mail.
40. In February, she asked Groleau when the project was going to be completed. He told her that it would be complete by April 30.
41. Relying on Groleau’s representation concerning the completion date, Russo-Gabriele and her husband exercised the right to terminate their apartment lease early, as of April 30,2012. They vacated the apartment at the end of April and moved temporarily to another apartment.
42. At about the time of Groleau’s completion estimate, John Durant, electrician for MCG, walked around with Richard and Shari Gabriele to mark each outlet, switch, fixture, cable box and data box prior to rough wiring. Wiring was placed where they indicated and signed off by the town inspectors.
43. The Town Building Department approved the “rough” electrical work on March 12, 2012.
44. The Town Building Department signed off on the rough plumbing for water and gas on April 9, 2012.
45. The Town’s fire department gave its “Rough OK” for the work on April 12, 2012.
46. In the beginning of April, there was a delay of about 4 weeks when Russo-Gabriele decided to change the planned three-season porch into a year-round space and tried to save costs by attempting to get Building Department approval without revising the architect’s plans. The Building Inspector did not accept that approach and required amended plans.
47. The Town’s inspection of April 13, 2012 resulted in a notation on the building permit: “will amend *516 permit.” Since the architect had other projects, it took several weeks to get revised plans. The amended permit then had to stand in line behind other projects awaiting Building Department approval.
48. In May or June, two additional delays occurred because of a shortfall in the amount of tile ordered by Russo-Gabriele, requiring the workers to wait. The tile company ran out of tile. Combined with an issue regarding installation of the granite countertops, this slowed the job down by a couple of weeks.
49. Some delays occurred when the Gabrieles changed mind on color and quality of paint and other finish items (e.g., May 14 and June 5 texts). Michael Groleau, subcontractor for MCG, applied primer and two to three coats of paint.
50. The Town Building Department signed off on the sheet metal for the HVAC ductwork on May 3, 2012. On the same day, the Building Department Inspection resulted in the notation: “Rough OK.” The Insulation was OK’d on May 8, 2012.
51. The Town Building Department found no unresolved code violations while Groleau was on the job.
52. On the morning of Tuesday, June 19, 2012, Groleau requested by text message an inspection of flooring, plumbing, and electrical. At the time, Russo-Gabriele was at her daughter’s middle school graduation.
53. Under the Bank’s policy, it would make a disbursement on the Thursday of a particular week only if Russo-Gabriele requested an inspection by noon on Tuesday.
54. On June 23, 2012, Russo-Gabriele met Groleau at the Property and gave him a check for $2,391.71. She told him that the check represented the difference between the extras set forth in the April 19th bill and the amount of allowances under the Contract that she had not yet taken. Groleau accepted the check without objection and immediately deposited it.
55. Russo-Gabriele made an error in her favor in the calculations for the check she gave to Groleau on June 23. She assumed an allowance of $3,500 for the fireplace when in fact the agreed-upon allowance was $2,250.
56. She presented a spread sheet to Groleau entitled “Payments Disbursed for House.” The presentation appeared to show that she had double counted her allowances.
57. When Groleau later brought these matters to her attention, Russo-Gabriele apologized and asked if he could forgive her. Her errors, though in her favor, were unintentional and, once explained, did not amount to a repudiation of her obligations.
58. On June 25, 2012, Groleau removed his tools and left the project permanently, returning only on July 9, 2012 to take photographs. Groleau did not inform either Russo-Gabriele or her husband of his departure or the reasons for same. The Gabrieles’ calls to Groleau went unreturned.
59. Groleau’s departure occurred four days prior to the date that Groleau projected that, the Building Department would issue a Certificate of Occupancy for the Properly.
60. The most recent Trinity inspection, which I credit, assessed the Project at 91.19% complete. Still remaining were:
Hardwood floors (45% complete; to do: hallway and living room);
Completion of tile work (80% complete);
Interior painting (90% complete only touch up and trim remaining);
Finish plumbing (15% complete);
Finish electrical (75% complete);
Items not yet begun: HVAC operational; smoke & CO detectors; Occupancy permit and certificates (all 0% complete).
61. Based on a project cost of $188,500 and Trinity’s estimate of 91.19% completion, Groleau had completed $171,900 of the work. The cost of the uncompleted contract work was approximately $16,600 (rounded to avoid a false precision).
62. On June 26, 2012, Russo-Gabriele and her husband caused the locks to the Property to be changed, thus resulting in Groleau’s inability to access the Properly. Thereafter access was limited to a painter, Dan Reid, who accessed the Property by a key that was left under a mat. After June 26, Groleau had no access to the Property by key.
63. Groleau performed no work at the Property during the month of July 2012.
RECONCILIATION OF PAYMENTS AND CONTRACTUAL OBLIGATIONS
64. Russo-Gabriele paid Groleau a total of $155,785 on the contract. There appears to be no substantial dispute on that point.
65. The contract contained allowances for certain items. Russo-Gabriele calculates the total allowances to be $24,026, leaving a net of $164,474 to be paid to Groleau upon his completion of the Project.
66. Groleau calculates a net payment of $169,201 upon completion. That implies allowances of $19,299.
67. The allowances in the Ground Up contract, which Groleau assumed, were:
Kitchen Cabinets and granite $7,500;
3 bath total allowance $8,000;
Kitchen faucet (taken on 2/12/12) $200;
Fireplace $2,250;
Tile (370 sq. ft. x $2/sq. ft.) $740;
Tile labor (see below) $1,480;
Hardwood floor ($3/sq. ft.) $756;
*517 Finish Electrical $1,750.
68. In his post-trial filings, Groleau incorrectly credits Russo-Gabriele only with the last three allowances.
69. The fireplace allowance was not explicitly set forth in the contract. I credit Groleau’s calculation of $2,250. Indeed, the Bank’s construction loans cost breakdown set forth a revised figure of $3,000 for the gas fireplace installed — i.e. including labor. Groleau’s estimate is consistent with the Bank’s number.
70. The tile allowance only included the material. Since Groleau did not provide the labor for tile installation, Russo-Gabriele was entitled to a labor credit in the amount of $1,480.
71. Total allowances, calculated as the sum of the above numbers, equal $22,676.
72. Adding allowances of $22,676 to the $155,785 paid by Russo-Gabriele, results in a total credit of $178,461.
73. Comparing the credit of $178,461 to the completed work of $171,900, Russo-Gabriele nominally overpaid Groleau by $6,561. However, some of the incomplete work (particularly tile, finish electrical and plumbing work) involved allowances that arguably should not have been taken against earlier, unrelated work — and in some cases were not taken yet.
74. Russo-Gabriele deducted the following allowances from the amounts disbursed by the banking calculating the following checks to Groleau:
Check Number Amount Allowance Taken
Check 93 (1/6/12) 18,045 Kitchen ($7,500)
Check 95 (1/27/12) $ 7,080 Fireplace ($2,500)
Check 73 (2/4/12) $ 3,000 ($l/500-Fireplace (error))
Check 79 (5/14/12) $ 3,600 (SLOOO-various expenses)
Check 104 (5/18/12) $10,000 ($3,600-various expenses)
75. On two occasions (February 10 and May 24, 2012), Russo-Gabriele also withheld funds, but paid them to Groleau the following week.
76. Russo-Gabriele thus took an erroneous allowance to which she was not entitled (Check 73) and took two ill-defined allowances (Check 79 and 104), which nevertheless may fairly be allocated to the as-yet-un-taken $8,000 allowances for the bathrooms.
77. There is room for debate and honest disagreement about when Ms. Russo-Gabriele was entitled to take allowances for work done by others, or for allowance items that she had already purchased for incorporation into work that was not yet complete. Once she purchased the item, it was clear to both parties that she would not be paying Groleau for it, even if the bank had yet to disburse funds to her for that item. Groleau had also received the $35,000 up-front payment. As noted above, the Bank did not disburse funds to Groleau, and Russo-Gabriele would deduct from the bank’s disbursements any sums that she had expended herself.
78. When Groleau left the job, he had been paid approximately in full for the work he had done under the contract (but, as found below, not for all extras). According to the same approximation, he had not been overpaid under the contract, with the two exceptions noted in the next several paragraphs, below. This is not surprising, as the Bank and Trinity monitored Project progress and released funds only after confirming that the payments had been earned.
79. Groleau accepted payments for two components of the Project even though he and Russo-Gabriele had agreed that the work would be done by others.
80. On May 31, 2012, the Bank’s disbursement to Russo-Gabriele included $1,150 for tile installation. Russo-Gabriele included the same amount in her check #113 to Groleau, dated June 8, 2012 in the amount of $3,925, bearing a “memo” reading in part “inlaid flooring . . .” Groleau did not perform the work in question. As agreed, others did.
81. The same May 31, 2012 Bank disbursement to Russo-Gabriele included $4,600 for the kitchen coun-tertops. Russo-Gabriele included the same amount in her check # 110, in the amount of $12,050, dated June 1, 2012, payable to Groleau, with a memo reading, in part “Countertops.” Groleau did not perform that work either, which others performed, as agreed.
82. Groleau did not return or credit Russo-Gabriele’s payments for installation of the kitchen countertop and installation of the tile. He was overpaid under the contract by $5,750.
83. Russo-Gabriele had not substantially breached the contract by failing to pay Groleau at the time he left the job. Whether or not she had paid precisely the amount due, she had substantially complied with her contractual obligation to pay Groleau according to the Bank’s disbursement schedule.
84. In view of the state of the project in the late spring of 2012, Russo-Gabriele’s extended family arranged to travel from Minnesota (where Russo-Gabriele is originally from) to visit her and her family in time for the Fourth of July weekend of 2012. The extended family had arranged to stay at the Properly. Because Groleau had left the project prior to its completion and the issuance of the certificate of occupancy, all family members ended up staying that weekend at Richard’s family’s home in Maine, and thereafter the Russo-Gabrieles spent several weeks commuting from Maine to their jobs at MIT Lincoln Labs.
85. Russo-Gabriele’s post-trial submissions do hot request reimbursement for lodging. It is not apparent from the evidence that there were any increased costs for lodging, compared to the cost of her prior lease. *518 She suffered inconvenience and loss of use of the Property, but has not proven that she paid more money than she would have paid if the project had been completed as promised, after allowing for delays that she caused.
86. In sum, because of the tile and countertop payments, discussed above, Groleau was overpaid under the contract by $5,750.
EXTRAS
87. Russo-Gabriele requested Groleau to perform certain work above and beyond the scope of the Contract. Groleau performed that work.
88. For extras, Groleau received checks dated 2/6/12 in the amount of $1,281.00 and 3/30/12 in the amount of $1,922.99.
89. On April 19, 2012, Groleau presented Russo-Gabriele with a bill for certain additional extra work that was in progress, but not completed. That bill included the following alleged extras (not including the allowances and credits also reflected on the bill):
Install remaining floor $2,688
Shower unit with valve $754
Plastering instead of patching $3,250
Porch floor insulation $500
HVAC overage $4,500
Weather trim on Bump out window $135
Install vent system $87
90. Ms. Russo-Gabriele’s own accounting (Ex. 7) included the same items and dollar amounts as “Extras we owe Curtis,” minus a $2,250 credit discussed below. Her total for the extras was $9,664.00. Without deducting the credit, the total extras amounted to $11,914.00.
91. Although the Contract required that all change orders be in writing, Groleau did not insist that Russo-Gabriele sign the April 19 extras bill because he found her trustworthy.
92. Russo-Gabriele paid $4,390.99 toward the window bump out, building rot and rear porch items, as Groleau acknowledged in his post-trial spread sheet.
93. Groleau received payment for the sums of $454 for electrical supplies and $2,250 for HVAC, as part of the check that Russo-Gabriele issued to Groleau on June 23.
94. Of the unpaid extras claimed by Groleau on April 19 and included in his post-trial spread sheet, he has proven that he is owed for: the unpaid portion of the HVAC overage ($2,250); Install vent system ($87); and the shower unit with valve ($754). Those items total $3,091.
95. The April 19 bill did not include the extra work done to convert the 3-season front porch into a year-round porch, which had not even been permitted by that date.
96. Groleau performed extra work in the amount of $3,000 for the four-season front porch.
97. Groleau claims a “budget vs. actual” item for hardwood floor installation. On this item, the scope of work indeed changed, requiring increased labor from about 11/2 day of work by one person to 5 days work for 2 men. The work also caused 2 to 3 days delay. Russo-Gabriele’s list of “Extras we owe Curtis” includes this item in the amount of $2,688. Groleau is entitled to that amount.
98. Groleau’s total unpaid extras (April 19 list, plus 4-season porch plus hardwood floors) therefore equaled $8,779.
99. As a good will gesture, Groleau did not charge Russo-Gabriele for a more costly installation on the roof (ice and water shield and tar paper) or for the value of a front door he provided, or for $1,600 in fixtures.
100. The parties claim a number of additional credits or extras, which the court has not found persuasive. They are discussed in the next several paragraphs, below.
101. The April 19, 2012 bill offset the “overage” for HVAC work (in the amount of $4,500), with an offset of $2,250 for “lodging,” effective until July 3, 2012. Groleau later withdrew that credit. He was under no obligation to extend that credit, for which there was no consideration. Of course, if his breach of contract caused lodging expenses, he would be required to pay them. That issue is discussed below.
102. In calculations he made in connection with his lien, Groleau identified the sum of $2,400, which he claims was for work he performed during July 2012. He later acknowledged that this was for work under the Contract. It is therefore not compensable.
103. Groleau’s post-trial spread sheet seeks funds for “budget vs. actual” on two items (HVAC and Hardwood). It is true that the Building Department application reflects $12,000, not $20,000 for heating and air conditioning as of August 12, 2011. It is, however, the contract that controls.
104. The fact that an actual cost exceeds budget does not justify a claim, because Groleau was contractually bound to provide what he promised even if the original estimate was erroneous. Russo-Gabriele did not intentionally mislead Groleau on this point. Groleau’s request for $12,000 is essentially a request to rewrite the contract because he does not like the deal.
105. Groleau has shown that the HVAC as installed differed from the Ground Up proposal, but he has not persuaded the court that he himself incurred any additional expense beyond that set forth in the April 19 bill (although the plaintiff apparently did pay more than the allowance). In his post-trial spreadsheet he cites only ‘Testimony” to support his claim of $12,500 *519 for this item. Given the absence of documentation and description of the alleged extra work, the court does not accept this claim, as opposed to the smaller claim reflected in the April 19 bill.
106. Groleau performed no further unpaid extras (work outside the Contract) for Russo-Gabriele after completion of the front porch conversion and the work described above and in the April 19 extras bill.
107. In sum, the unpaid extras of $8,779 exceeded the overpayment on the contract amounting to $5,750. While a net balance of $3,029 was due to Groleau, Russo-Gabriele had not substantially failed to perform under the contract. Groleau was not relieved of a duty to perform under the contract.
EVENTS AFTER GROLEAU’S DEPARTURE FROM THE JOB SITE
108. On June 26, 2012, Russo-Gabriele sent letters to the Town Building Department requesting that Groleau’s subcontractors, (subcontractors John Durant, Electrician, Timothy Hartigan, HVAC and David Makie, Plumber) be excused from the work under the current building permit.
109. On July 2, 2012, Russo-Gabriele received a voice mail message from Timothy Hartigan, the HVAC subcontractor on the project, stating that he was considering a lawsuit against Groleau for non-payment of his bill on the project.
110. She left a voice mail message the next day asking the Building Department to cancel the letters releasing the subcontractors.
111. At this time, Russo-Gabriele also had difficulty coming up with additional funds to pay what Groleau was demanding.
112. On July 3, 2012, Shari and Richard Gabriele met at the Bank with Groleau and Ralph Nichols, then a Senior Vice President of the Bank.
113. At the meeting Groleau set forth amounts he believed to be owed at that time.
114. On the advice of her counsel, Russo-Gabriele demanded at the meeting that Groleau secure lien waivers from his subcontractors. Groleau agreed to do so.
115. He also agreed to return to the project and complete it by July 23, 2012. He also agreed to a per diem, charge of $100 per day for each day beyond July 23 that the project was not completed.
116. On July 19, 2012, the Bank disbursed funds to pay for the work that was the subject of the request.
117. After the July 3 meeting, Russo-Gabriele sent several e-mails and texts to Groleau asking when he was returning to complete the project. Groleau responded that he wished to return and complete the work but that he was not feeling well.
118. On July 27, 2012, Groleau sent a text message to Russo-Gabriele stating that he would return to the project only if he were paid in. advance.
119. In or about August 2013, Groleau pulled the file on the Property at the Needham Building Department.
120. Groleau denies that he drew a line through his signature on the affidavit, in an after-the-fact effort to disclaim his involvement as contractor on the project. He was, however, the only person who had a motive and opportunity to do so. I credit the testimony of Ms. Russo-Gabriele and the Building Inspector that they did not draw the line through his name. Groleau’s denial was false.
121. Meanwhile, Russo-Gabriele undertook to find new contractors to complete the work.
122. On July 31, 2012, she wrote to the Town Building Department, stating that she was removing Groleau and his subcontractors (John Durant, Electrician, Timothy Hartigan, HVAC and David Makie, Plumber) from the Project. She sent separate letters on August 14, 2012, requesting that each of the subcontractors be excused.
WORK BY NEW CONTRACTORS
123. Russo-Gabriele hired Ethan Briggs, a carpenter, to perform certain corrective work as well as work covered under the contract and work covered by Home Depot’s warranties. The corrective work consisted of replacing flammable material located immediately above the fireplace, as the installation manual required that non-flammable material be installed. Briggs also installed shelving, handrails, a glass shower door, microwave oven, handle lock sets and door trim, among other work. Briggs charged and was paid $4,525.00 by Russo-Gabriele for its work.
124. As noted in Russo-Gabriele’s post-trial spreadsheet, some of Briggs’ work was done to complete the contract. Since there was still some funding left on the contract, according to Trinity’s calculation, it was Russo-Gabriele’s responsibility to pay for completion of the contract. There is no credible evidence suggesting that — to the extent Briggs’ work consisted of completing the contract according to original specifications — the work reasonably cost more than Russo-Gabriele would have paid according to the original contract price, particularly after mitigation.
125. Although Ethan Briggs re-installed the cabinets, Groleau had installed them based upon the original design, which also met the Home Depot specifications. Briggs testified that there was an industry standard that the cabinet be 54" above the floor. That does not persuade the court that the original cabinet installation breached the contract. Russo-Gabriele is not entitled to compensation from Groleau for that item.
126. Ethan Briggs also re-installed the microwave, to allow greater clearance above the stove. While *520 Groleau had been on the job, no Town official had cited a problem with the clearance.
127. Ethan Briggs worked on the fireplace, installing it according to manufacturer’s instructions so that the door would open. There is no credible evidence that the fireplace as installed by Groleau deviated from the building code, as opposed to from the manufacturer’s instructions.
128. The fireplace installation appeared finished and complete when Briggs saw it, unless the owner wanted to install a hearth. Groleau did not install the hearth. The company that supplied the granite did that.
129. Groleau did install the wood underneath the hearth. It was, however, the granite company’s responsibility to produce an end product at the right level above the floor and below the fireplace.
130. Briggs’ work on the fireplace did not correct any defective work by Groleau and therefore is not compensable.
131. Ethan Briggs installed railings, doors, handsets and closet inserts. These items completed the contract. There is no credible evidence that the reasonable, mitigated cost exceeded that set forth in the contract.
132. Russo-Gabriele paid Briggs $78 per hour. That was more than twice the Plaintiffs wage. Ethan Briggs received his hourly rate for travel from New Hampshire and to testify at the trial. Russo-Gabriele had the duly to mitigate her damages and has the burden of proof to show that she has done so. The court is not persuaded that she lacked the abilify to find a competent contractor at Groleau’s hourly rate to do the work, without payment for travel from New Hampshire. She has failed to prove that she mitigated her damages.
133. OnAugust23,2012, the town inspector found that one of the air conditioning condenser units that had been installed while Groleau was on the project was located too close to the gas meter. Russo-Gabriele engaged MacFarlane Energy to relocate the condenser in late August 2012. This work repaired defective work by Groleau, who breached the contract by placing the condenser too close to the meter. The cost of this item is $1,041. Russo-Gabriele is entitled to damages in that amount.
134. MacFarlane performed additional necessary modifications to work performed while Groleau was the contractor on the project. It enlarged air returns on the second floor and removed and re-installed duct work in the cellar as a result of wires that MacFarlane believed had been improperly installed. Groleau’s installation of those wires did not, however, breach the contract.
135. As previously noted, the Town and Trinity had inspected the HVAC system with no findings of code violations. (See: March 8 2012 disbursement for heating system, HVAC ductwork sign off 5-3-2012, plumbing sign off 4-9-12, electrical sign off 3-12-12, fire department sign off 4-12-12.) It is true that wires were installed after those sign-offs. While the sign-offs therefore did not evaluate the placement of the wires, the changes in the heating systems left Groleau without direction regarding placement of the wires. He did not violate any contractual obligation by placing the wires where he did.
136. MacFarlane charged and was paid $6,196.38 for its work, which Russo-Gabriele paid. Apart from replacing the condenser, this work added value to the project, as a result of the change in HVAC design and installation, compared to the original contract. Had Groleau been on the project, Russo-Gabriele would have had to pay for this work as an extra. She has incurred no damages attributable to Groleau on this item.
137. The finish electrical work done by Systems Electrical Services, Inc. was an incomplete item under the contract, for which the Bank had not yet made disbursement. The bill was $2,392.80. The Bank disbursed $3,790 for “finish electric & heat Oper.” on August 16, 2012. There is no credible evidence that Russo-Gabriele suffered any damages as a result of Systems Electrical performing this work, as opposed to Groleau.
138. Russo-Gabriele’s post-trial spreadsheet does not include items for painting. In any event, the very large number of coats of paint, and the higher qualify paint requested by Gabriele, were more than contemplated by the Contract. The payments to Dan’s Painting therefore are not recoverable as contract damages.
139. Russo-Gabriele paid $1,150 to Kirkland & Shaw, Inc. for plumbing work. As noted by Trinity, the finish plumbing was only 15% complete when Groleau left the job, leaving substantial funds for the Bank to disburse for this item. There is no credible evidence that Russo-Gabriele paid more for finish plumbing than she would have paid if Groleau had finished the contract.
140. Russo-Gabriele also paid GoGreen Industries, Inc. for a boiler and related hot water systems, as well as certain additional work. Some of this was for finish plumbing, which (as just noted) was an open item under the contract for which funds were still available to Russo-Gabriele. Some of the payments to GoGreen were for qualify and equipment upgrades, for which she would have had to pay extra in any event.
141. Steven Cuzziere of GoGreen completed the work to “best practices” which exceeds code and is more expensive than building to code. For instance, he re-assembled the Lochinvar unit to conform to “best practices.” The make-up air in the second floor was a customer add-on to meet “best practices” construction.
142. There is no credible evidence that Russo Gabriele incurred additional cost for GoGreen to com- *521 píete the work within the contract’s scope of work, which did not incorporate a “best practices” standard of quality.
143. The Town Building Department gave its “final OK” and issued a certificate of occupancy for the Property on September 17, 2012.
144. In sum, Russo-Gabriele has proven $1,041 in additional costs attributable to completion of work within the scope of the contract. While Groleau is entitled to the unpaid extras of $8,779, he owes an offsetting amount of $6,791, because he was overpaid on the contract by $5,750 and owed the $1,041 for increased costs of completion.
145. When all is said and done, Russo-Gabriele owes Groleau $ 1,988, without taking account of the c. 142A and c. 93A issues.
MECHANIC’S LIEN
146. The plaintiff recorded a notice of contract with the Norfolk Couniy Registry of Deeds on August 13, 2012 Book 30302 page 495 #96318 seeking to enforce a mechanic’s lien against the property located at 107 Central Ave. Needham, Norfolk County, Massachusetts.
147. The plaintiff filed a notice of termination and an accounting with the Norfolk County Registry of Deeds on November 13, 2012 seeking to enforce the lien.
148. Plaintiff also provided written notice of lien to defendant.
ARBITRATION REQUEST
149. After learning of the HIC registration requirement, Russo-Gabriele sought to refer this action to the Home Improvement Contractor Arbitration Program (HICARB), which is administered by the Mass. Office of Consumer Affairs and Business Regulation (OCABR).
150. Groleau opposed Russo-Gabriele’s efforts to obtain HICARB arbitration because he believes that arbitration proceedings are tilted in favor of homeowners.
151. On March 26, 2013, this court (Walker, J.) ordered this matter to arbitration under counts I and II.
152. OCABR declined jurisdiction over the parties’ dispute because Groleau was not a registered HIC as of the date the parties signed the Contract.
153. Had Groleau been registered, the HICARB program would have accepted this case, regardless of the Affidavit that Russo-Gabriele signed.
154. On April 30,2013, therefore, the court (Walker, J.) allowed Groleau’s motion for reconsideration and returned the case to this court for adjudication in the normal course.
155. It is difficult to assess what course this case would have taken if it had been arbitrated through the HICARB program. However, the court had the benefit of testimony by an attorney experienced in HICARB arbitrations, as well as the Administrator for the Arbitration Program and Guaranty Fund over the past 14 years. The court has received substantial assistance from the testimony of these two witnesses, who were both credible and knowledgeable.
156. In HICARB arbitration, the filing fee for Groleau’s $28,000 claim would have been $600 and the filing fee for Russo-Gabriele’s $15,000 claim would have been $450. The total fee for four hours of hearing would therefore be $1,050.
157. If additional time was needed for the hearing (up to 6 hours total), the arbitrator may charge $150 per hour, with the parties sharing cost.
158. HICARB litigation of a matter like this one generally concludes in no more than six months, requiring about 50-60 hours of attorney time to take the case through the conclusion of the hearing.
159. The HICARB program does not permit discovery and limits pre-hearing disclosures to an exchange of documents. There is no requirement to disclose expert witnesses or to file pre-trial memoranda, as in the Superior Court.
160. Unless there is a claim under G.L.c. 93A, attorneys fees are not awarded in HICARB arbitrations.
161. Given the amounts in controversy and the level of attorneys fees required to litigate this case fully without arbitration (or equivalent efficient dispute resolution mechanism), the court credits Russo-Gabriele’s testimony that she would have accepted an arbitrator’s decision without subsequently instituting a court action.
DISCUSSION
A. CONTRACT
Each of the items for which I have found damages reflects a breach of the contract. In some instances, the item was part of the original contract. In others, the item reflects a separate agreement to perform extra work. A third item represents an increase in the cost to the homeowner caused by the contractor’s unjustified refusal to finish the job. The court has netted out the various items. Payment by Russo-Gabriele of the sum of $1,988 will provide both parties with the benefit of the bargain under their Contracts. Groleau therefore is awarded that amount as damages under Count I. See generally Quinn Bros. v. Wecker, 414 Mass. 815 (1993). Having recovered on his contract claim, Groleau may not also recover in quantum meruit (Count II). MCI WorldCom Communications, Inc. v. Department of Telecommunications & Energy, 442 Mass. 103, 116 (2004).
Russo-Gabriele asserts that Groleau also breached his contract by walking off the job on June 25, less than a week before anticipated completion. A contractor may terminate a contract upon the material breach of the contract by a homeowner. Petrangelo v. Pollard, 356 Mass. 696, 701 (1970). The non-payment of a “substantial sum of money” to a contractor constitutes a material *522 breach of the contract and would justify a contractor’s termination of the contract. Id. A breach of contract is “material” when it involves an “essential and inducing feature of the contract.” Lease-It, Inc. v. Massachusetts Port Authy., 33 Mass.App.Ct. 391, 396 (1992), quoting from Bucholz v. Green Bros., 272 Mass. 49, 52 (1930). An insignificant or accidental breach does not entitle the non-breaching party to terminate the contract. DiBella v. Fiumara, 63 Mass.App.Ct. 640, 644 (2005).
In this case, Groleau was entitled to payment for work when approved and funded by the Bank. Looking solely at the written contract, as of June 25, Groleau was overpaid by $5,750 for tile and counter top work that he did not do. That obviously gave him no right of termination at all. On the contrary, even if there were no contract, he would have to credit or return the funds.[1]
Considering all of the transactions, as found above, Groleau was arguably owed a net balance of $3,029 when he left the job, but he offered, then withdrew a $2,250 lodging credit, which would have decreased the balance to the paltry sum of $779. Even then, there was room for debate about the timing of taking allowances. Russo-Gabriele was not in material breach as of June 25. Groleau had no right to terminate the Agreement.
B. HOME IMPROVEMENT CONTRACTORACTAND c. 93A
1. Validity of the Contract
The Home Improvement Contractor Act, G.L.c. 142A, imposes specific obligations upon home improvement contractors. These obligations would also be implied in the Contract, were they not specifically set forth in statute. Under G.L.c. 142A, §17, a contractor may not “(1) operat[e] without a certificate of registration ... (2) deviat(e) from or disregard!) plans or specifications in any material respect without the consent of the owner... (10) violat[e] the building laws of the commonwealth or of any political subdivision thereof.” Violation of G.L.c. 142A is per se an unfair and deceptive act or practice within the meaning of the Consumer Protection Act, G.L.c. 93A. G.L.ch. 142A, §17(1). See Reddish v. Bowen, 66 Mass.App.Ct. 621, 626-27 (2006); Mercado v. Manny’s T.V. & Appliance, Inc., 77 Mass.App.Ct. 135, 136, 139-40 (2010); Meyer v. Nantucket, 78 Mass.App.Ct. 385, 395 (2010).
Section 9(a) of G.L.c. 142A provides:
No contractor or subcontractor shall undertake, offer to undertake or agree to perform residential contracting services unless registered therefore with the approval of the bureau of building regulations and standards.
Groleau violated this provision, because he was not registered when he agreed to perform the project. However, it does not follow that the contract is automatically unenforceable. “Courts do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law.” Febonio v. Thelen, 2010 Mass.App.Div. 65, (Mass.App.Div. 2010) (emphasis added),[2] quoting Beacon Hill Civic Ass’n v. Ristorante Toscano, Inc., 422 Mass. 318, 320-21 (1996), quoting Nussenbaum v. Chambers & Chambers, Inc., 322 Mass. 419, 422 (1948). Chapter 142A itself imposes limits upon contract invalidation. “Contracts which fail to comply with the requirements of [section 2] shall not be invalid solely because of noncompliance.” G.L.c. 142A, §2. See Yetman v. Cavanaugh, 73 Mass.App.Ct. 1115 (2009). The court therefore accepts the validity of the parties’ contract, instead of resorting to quantum meruit relief.
2. Counterclaim
a. Entitlement to Relief Under G.L.c. 142A and c. 93A
Gabriele-Russo also seeks affirmative relief for violation of the Home Improvement Contractor Act, independent of any contractual breach. Herman v. Admit One Ticket Agency, LLC, 454 Mass. 611, 616 (2009). To recover for a 93A, §2 claim “there must be a violation of 93A, §2, there must be an injury and there must be a causal connection between the injury suffered and the defendant’s unfair or deceptive method, act or practice.” Williams v. Perrault, 82 Mass.App.Ct. 1117 (2012) (injury where a contractor did not obtain any required permits and performed both plumbing and electrical work without a license which violated Mass. Code and was a hazard to the homeowner).
Violations of G.L.c. 142A (and of G.L.c. 93A) — particularly of the type alleged here, which do not automatically involve financial injury to the homeowners — do not establish liability without a showing of damage:
Here, the Mahers’ claim of injury is their payment of the 30-43% markup that Cape Painting added to its labor and materials, and to the bills submitted by its subcontractors. The Mahers presented no evidence, however, that they were worse off than they would have been had Cape Painting complied with G.L.c. 142A, §§2(a) and 2(a)(5). They failed to present evidence, in other words, that they would not have paid a markup if Cape Painting had provided them with a written contract including the total agreed cost of the project.
Cape Painting & Carpentry, Inc. v. Maher, 2009 Mass.App.Div. 22 (Mass.App.Div. 2009), aff'd, 76 Mass.App.Ct. 1110 (2010) (Rule 1:28 Decision) (“We affirm, substantially for the reasons stated in the Appellate Division’s thorough and thoughtful decision”), review denied, 456 Mass. 1104 (Mass. 2010). The real question therefore is whether damages flow from Groleau’s failure to register as an HIC contractor:
[A] causal connection must exist between the unfair or deceptive conduct and the injury, see Hershenow v. Enterprise Rent-A-Car Co. of Boston, 445 Mass. 790, 797-800 (2006), and the injury must be a “separate, identifiable harm” that is “distinct” from the unfair or deceptive conduct itself. Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013).
*523 Bellerman v. Fitchburg Gas. & Elec. Co. (No. SJC-11492, October 30, 2014); see Williams v. Perrault, 2011 Mass.App.Div. 180 (Mass.App.Div. 2011). As a consumer, Russo-Gabriele “may recover for both economic and personal losses.” Bellerman, at n.9, citing Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 175(2013).
The answer is “yes.” In this case, violations of c. 142A led to injuiy that qualifies for relief under c. 93A.
First, the availability of arbitration with a registered HIC is a central feature of c. 142A, which “reflects an intention to facilitate a homeowner’s c. 93A remedies.” Simas v. House of Cabinets, Inc., 53 Mass.App.Ct. 131, 137 (2001). A registered HIC impliedly consents to arbitration before OCABR. G.L.c. 142A, §4(b). No contract between a contractor and homeowner may result in a waiver by the homeowner of OCABR arbitration rights. G.L.ch. 142A, §2(a)(9). If Groleau had been a registered HIC as of the date of the parties’ contract, Russo-Gabriele would have had the right to arbitrate the parties’ dispute through OCABR. G.L.c. 142A, §4. The deprivation of Russo-Gabriele’s right to arbitration through the HICARB program constitutes an “injuiy” as defined by Ch. 93A sec. 9. Groleau’s violation of Ch. 93A caused Russo-Gabriele to sustain “injury” in that she lost a right to arbitrate, and she incurred additional attorneys fees as a result of having to defend herself against a contractor who was prepared to litigate fully.
Second, it is a violation of Ch. 142A and correspondingly Ch. 93A, for a contractor to abandon any contract or project. G.L.ch. 142A sec. 17(2) and (17). Groleau abandoned the project without justification on June 25, 2012. He was not owed substantial funds by Russo-Gabriele on a net basis and had accepted payment for work he did not perform on the tile and countertop installations. Groleau’s abandonment violated c. 93A.
Groleau’s abandonment caused Russo-Gabriele to sustain “injuiy” in the form of (a) $1,041 in additional costs attributable to completion of work within the scope of the contract and (b) deprivation of occupancy of the Property that she otherwise would have enjoyed as of approximately June 29, 2012. She has not attempted to quantify the value of the deprivation of occupancy.
Groleau’s violations of c. 93Awere notwillful, but were based upon an incorrect and negligent interpretation and understanding of his obligations under G.L.c. 142A. The court therefore declines to award multiple damages.
b. Waiver of Arbitration
Groleau argues that Russo-Gabriele waived her rights to arbitration by signing the Affidavit. This argument fails for two reasons.
First, the statute makes it unlawful for any agreement for residential contracting services to contain a provision that would “waive any rights conveyed to the owner under the provisions of this chapter.” G.L.c. 142A, §2(a)(9). One of the owner’s rights under c. 142A appears in §4, which reads in relevant part:
(a) There shall be a private arbitration services program approved by the director, to consider disputes between owners and registered contractors and subcontractors, concerning or arising from contracts for residential contracting services . . .
(b) All registered contractors and subcontractors who enter into contracts for residential contracting impliedly consent to the provisions contained in this section.
(c) A contractor or subcontractor who is required to submit to arbitration as a result of an owner’s application for arbitration may file a counterclaim, based on or arising from the same contract, in that arbitration.
(d) All findings of fact issuing from arbitration shall be taken as prima facie evidence in any subsequent appeal brought by either party ensuing from the matter considered in said arbitration.
Under this section, the homeowner has the right to seek arbitration. Therefore, the contract may not contain a provision waiving arbitration. It is true that, in this case, Groleau did not put the waiver in the contract, but instead told Russo-Gabriele that she had to sign the Affidavit; he was also not a registered contractor. None of that makes a difference. Section 4 states the right to arbitration in positive terms, requires the registered contractor to consent, and includes no language suggesting that the statutoiy command is subject to waiver by the parties. If section 4. rights were waivable, then §2(a)(9) would effectively be a dead letter or, at most, a trap for unwaiy contractors who obtained the waiver in a contract rather than in a separate document. The statute addresses matters of substance and cannot be evaded by form. Nor can the homeowner consent to Groleau acting without a HIC registration.
Second, the Affidavit does not in fact waive the owner’s statutory rights by its terms. Even more, it does not waive c. 142 rights in a clear and conspicuous way, which would ordinarily be expected in a consumer transaction where the business person claims a waiver of statutoiy consumer protection rights. The Affidavit is a Town of Needham form and does not appear to create or alter private contractual rights. The legend on the Affidavit is only a “notice.” It merely notified the signatory that “[o]wners pulling their own permits or dealing with unregistered contractors for applicable home improvement work do not have access to the arbitration program or guaranty fund under M.G.L.c. 142A.” This purports to be a statement of law. Nothing in the language suggests that, by signing, a consumer assents to a private agreement that waives statutory rights. The court does not construe the Affidavit to amount to a contract to waive arbitration or the right to a HIC-registered contractor, even if the statute allowed such waivers.
It follows that Russo-Gabriele never waived her rights to arbitrate and to have an HIC-registered contractor.
*524 3. Attorneys Fees
Both sides seek their attorneys fees. The court reserved the question of fees for resolution on motions post-trial, in the event that either side proved entitlement to fees.
a. Groleau’s Fee Claim
Groleau seeks his attorneys fees based upon the provision in the Agreement that “[a]ny legal fees on collectables shall be will be [sic] paid by homeowner Shari Russo.” There is nothing illegal about such an arrangement. Groleau’s “collectables” in this case are very small, but that may affect the amount of fees, not his entitlement.
Russo-Gabriele argues that Groleau is not entitled to fees at all. She reasons that an arbitrator deciding a dispute between a homeowner and a registered HIC may not award attorneys fees. 201 CMR 14.15(7). She then points out that, had Groleau been registered as an HIC as of the date of the Contract, he would not have recovered attorneys fees based on that regulation. She also argues that Groleau should be barred from recovery of attorneys fees as a matter of public policy, because he should not fare better than he would have in arbitration if he had complied with his obligation to register under Ch. 142A.
The problem with this argument is that nothing in c. 142Abars post-arbitration litigation in court or recovery of fees in such litigation. The fact that an arbitrator may not award fees does not imply that Groleau lacks recourse in court. He therefore may submit a fee request.
b. Russo-Gabriele’s Fee claim
Under G.L.c. 93A, §9, Russo-Gabriele is entitled to reimbursement of her attorneys fees for her successful prosecution of the c. 93A claim. She may submit a request for such fees.
She has also shown an entitlement to attorneys fees as part of the injury or harm caused by the inability to arbitrate. It is likely that, if this matter were arbitrated, both sides would have saved substantial time and attorneys fees, because resolution of this case entails only a very small amount of damages awarded to the contractor. The court credits Russo-Gabriele’s testimony that she would have accepted an arbitrator’s award. It is harder to know what Groleau would have done. Faced with findings by an arbitrator of a low recovery, which have prima facie effect in this court (G.L.c. 142A, §4{d)), economics and rational business decision-making would dictate accepting the award and moving on. The court infers that Groleau would reluctantly have done so, rather than throw good money after bad.
4. Mechanic’s Lien
Groleau took all steps necessary to perfect the lien against the property pursuant to M.G.L.c. 254. A primary purpose of G.L.c. 254 is “to provide security to carpenters, subcontractors, laborers, and suppliers for the value of their services and goods provided for improving the owner’s real estate.” Hammill-McCormack Assocs. v. New England Tel & Tel Co., 399 Mass. 541, 542-43 (1987).
For the reasons stated above, the amount of the lien is, plus such costs and fees as may be awarded in later portions of this case.
CONCLUSION
For the above reasons, after a trial to the court sitting without j ury, the court rules as follows, subj ect to further proceedings to determine attorneys fees and costs:
1. Judgment for the plaintiffs, Curtis A. Groleau shall enter on count I of his complaint against Shari Russo-Gabriele in the amount of $1,988 plus attorneys fees and costs to be determined.
2. The amount of the plaintiffs mechanics lien is $1,988, plus attorneys fees and costs to be determined.
3. Judgment for the defendant Shari Russo-Gabriele on Counts II-IV of the Complaint.
4. Judgment for the plaintiff-in-counterclaim Shari Russo-Gabriele on count I of her amended counterclaim in the amount of $1,041, which amount is, however, already included as an offset to the award to plaintiff, as stated in paragraph 1 above. Plaintiff-in-counterclaim is also entitled to attorneys fees and costs in an amount to be determined.
5. Judgment for the defendant-in-counterclaim Curtis A. Groleau on count II of the amended counterclaim.
6. The parties shall serve their motions for fees and costs pursuant to Superior Court Rule 9A on or before December 20, 2014, with responses due on January 20, 2015.

 Having received sums from Russo-Gabriele in payment for work that, by the parties’ agreement, he did not perform, Groleau must return to Russo-Gabriele the funds so received. See Cobb v. Library Bureau, 268 Mass. 311, 316 (1929) (“An action for money had and received to the plaintiffs use ordinarily lies to recover money which should not in justice be retained by the defendant and which in equity and good conscience should be paid to the plaintiff’).

 In rejecting an argument for outright contract invalidation, the Massachusetts Appellate Division has noted:
When taken to its extreme, [the homeowner’s] argument could provide enormous windfalls to homeowners for whom extensive renovation work was performed perfectly well by contractors who were unlicensed for the most benign of reasons, including the inadvertent failure to renew or a reasonably mistaken belief that such licensing was unnecessary.
Febonio v. Thelen, 2010 Mass.App.Div. 65 (Mass.App.Div.2010). Even if the Agreement itself were void for violation of the statutory public policy, recovery may be limited rather than prohibited altogether. See Town Planning & Engineering Associates, Inc. v. Amesbury Specialty Co., 369 Mass. 737, 747 (1976) (“ ‘Justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants.’ ... In a case of illegality, serious but not so serious as to defeat the action, the plaintiff, though permitted a judgment, might be made to suffer a sanction through the reduction of his recovery to a quantum meruit less than the contract price”), quoting 6A A. Corbin, Contracts §1512, at 713 (1962).